1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TYLER JORDAN TORRES,<br><br>                          Petitioner,<br><br>v.<br><br>SCOTT KERNAN, Secretary,<br><br>                          Respondent. | Case No.:  16cv0870-MMA (AGS)<br><br>**AMENDED[1] ORDER DENYING PETITION FOR  WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY** |

Petitioner Tyler Jordan Torres is a state prisoner proceeding *pro se* and *in forma pauperis* with a Petition for a Writ of Habeas Corpus ("petition") filed pursuant to 28 U.S.C. § 2254.  Petitioner challenges his San Diego Superior Court convictions for two counts of assault by means likely to produce great bodily injury, two counts of battery on a peace officer, and one count of resisting an officer, for which he was sentenced to nine years and four months in prison.  *See* Petition ["Pet."] at 1-2 [Doc. No. 1 at 6-8]. Petitioner claims that his Sixth Amendment rights were violated by the denial of his repeated requests to replace his appointed trial counsel (Claim 1); the ineffective assistance of trial counsel in numerous respects, including a conflict of interest (Claim 2);

---

[1] This Order amends page 3, lines 7-8, of the Court's July 24, 2017 Order [Doc. No. 23] to accurately reflect the Court's decision not to issue a certificate of appealability.

and the ineffective assistance of appellate counsel for failing to raise an ineffective assistance of trial counsel claim on appeal and failing to file a petition for a writ of certiorari in the United States Supreme Court (Claim 3). *See id.* at 23-37 [Doc. No. 1 at 25-39].

Respondent has filed an Answer and lodged the state court record. *See* Doc. Nos. 14-15, 18. Respondent argues that habeas relief is not available because the state court adjudication of Claims 1 and 2 is neither contrary to, nor involves an unreasonable application of, clearly established federal law. *See* Memorandum of Points and Authorities in Support of Answer ("Ans. Mem.") at 15-24 [Doc. No. 14.1 at 20-29]. Respondent further contends that Petitioner has not exhausted his state court remedies as to Claim 3, but that habeas relief should be denied notwithstanding the failure to exhaust because the claim is without merit.

Petitioner has filed a Traverse. *See* Doc. No. 16. He contends Claim 3 was presented in his California Supreme Court habeas petition and is therefore exhausted; an evidentiary hearing is necessary to investigate the depth of trial counsel's conflict of interest; and, even if any single allegation of deficient performance of trial counsel was not prejudicial, he was prejudiced by their cumulative effect. *See* Traverse at 4-8 [Doc. No. 16 at 4-8]. Petitioner has submitted a copy of a second state supreme court habeas petition he filed on September 15, 2016, after the Answer in this action was filed, in which he presented Claim 3 "to ensure exhaustion of state remedies," along with a copy of the April 19, 2017 order denying the petition as successive and untimely. *See* Doc. No. 21.

For the following reasons, the Court finds that habeas relief is not available as to the claims which were adjudicated on the merits in state court (Claim 1 and Claim 2, in substantial part), because the state court adjudication of those claims is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. To the extent Petitioner can satisfy that standard as to the aspect of Claim 2 which alleges his trial counsel was deficient in

failing to present a defense based on Post-Traumatic Stress Disorder ("PTSD"), the Court finds that habeas relief is not available because Petitioner has failed to demonstrate he was prejudiced as a result of that failure. The Court finds that habeas relief is unavailable as to the claims which were not adjudicated on the merits in state court, which include Claim 3 and that aspect of Claim 2 alleging trial counsel conceded guilt, because they do not present colorable claims for relief and fail on the merits under a *de novo* review. Finally, the Court finds that an evidentiary hearing is neither necessary nor warranted on the conflict of interest aspect of Claim 2, as requested by Petitioner, nor as to any other claim raised. For the reasons set forth in further detail below, the Court **DENIES** the petition without holding an evidentiary hearing, and **DECLINES** to issue a Certificate of Appealability.

## PROCEDURAL BACKGROUND

On March 19, 2012, the San Diego County District Attorney's Office filed a five-count Information charging Petitioner with two counts of assault by means likely to produce great bodily injury in violation of California Penal Code section 245(a)(1) (counts 1-2 arising from the events of December 15, 2011), two counts of resisting an executive officer in violation of Penal Code section 69 (count 3 arising from the events of December 15, 2011 and count 4 arising from the events of April 24, 2011), and one count of battery upon a peace officer in violation of Penal Code section 243(b) (count 5 arising from the events of April 24, 2011). *See* Lodgment No. 1, Clerk's Tr. at 61-63 [Doc. No. 15.1 at 67-69]. As to the first two counts, the Information alleged that Petitioner personally inflicted great bodily injury on the victims within the meaning of Penal Code section 12022.7(a). *Id.*

On September 26, 2012, a jury found Petitioner guilty on all counts and returned true findings that he personally inflicted great bodily injury during the commission of counts one and two. *Id.* at 232-36 [Doc. No. 15.1 at 238-42]. Petitioner was sentenced to nine years and four months in state prison on December 14, 2012. *Id.* at 239 [Doc. No. 15.1 at 245].

Petitioner appealed, raising, *inter alia*, Claim 1 presented here. *See* Lodgment Nos. 6-8 [Doc. No. 15.15-17]. The appellate court affirmed in all respects. *See* Lodgment No. 9, *People v. Torres*, No. D063150 (Cal. Sup. Ct. Mar. 3, 2015) [Doc. No. 15.18]. Petitioner then filed a petition for review in the California Supreme Court presenting, *inter alia*, Claim 1 raised here. *See* Lodgment No. 10 [Doc. No. 15.19]. On June 17, 2015, the petition was summarily denied without a statement of reasoning or citation of authority. *See* Lodgment No. 11 [Doc. No. 15.20].

On July 22, 2015, Petitioner filed a habeas petition in the state superior court raising, *inter alia*, Claim 2 presented here. *See* Lodgment No. 12 [Doc. No. 15.21]. The petition was denied in a written order filed on August 28, 2015. *See* Lodgment No. 13 [Doc. No. 15.22]. Petitioner filed a habeas petition in the state appellate court on September 25, 2015, presenting the same claims. *See* Lodgment No. 14 [Doc. No. 15.23]. The petition was denied in a written order filed on October 26, 2015. *See* Lodgment No. 15 [Doc. No. 15.24]. Petitioner filed a habeas petition in the California Supreme Court on December 2, 2015, presenting, *inter alia*, Claim 2 raised here. *See* Lodgment No. 16 [Doc. No. 15.25]. As discussed below, the parties dispute whether Claim 3 was also presented in that petition. The petition was summarily denied without a statement of reasoning or citation of authority on April 13, 2016. *See* Lodgment No. 17 [Doc. No. 15.26]. Finally, on September 15, 2016, the same day he filed his Traverse in this action, Petitioner filed a second habeas petition in the state supreme court raising Claim 3 here. *See* Doc. No. 21. The petition was denied on April 19, 2017, with an order which stated: "The petition for writ of habeas corpus is denied. (See In re Clark (1993) 5 Ca.4th 750, 767-769.)." *Id.* at 3.

///

The following facts are taken from the California Court of Appeal opinion affirming Petitioner's convictions on direct appeal. This Court gives deference to state court findings of fact and presumes them to be correct. *Sumner v. Mata*, 449 U.S. 539, 545-47 (1981).

Prosecution

During the early morning hours of April 24, 2011, Derrick Young, an officer with the San Diego Police Department (SDPD), was patrolling Garnet Avenue in a marked patrol van and in full uniform. Around 1:30 a.m. to 2:00 a.m. that morning, Young and his partner, Officer Nicholas Minx, who also was in full uniform, were at the corner of Garnet and Everts performing a traffic stop. Three people contacted them and said a man was riding his bicycle on Garnet, challenging people to a fight and kicking them. As Torres rode a bicycle on Garnet toward Young and Minx, one of the people identified Torres as the man in question. Young stepped in front of Torres's path and ordered him to stop because he needed to talk to him. Torres, who appeared very angry, continued riding, looked right at Young, and said, "Fuck you." Young stepped to the side, and, as Torres continued to ride, used his right hand to grab Torres by the left arm. Torres got off balance and stopped the bike with one leg straddling either side of it. Torres looked at Young and said, "Fuck you, now it's on." Torres, who appeared to be drunk and smelled of alcohol, attempted to pull his left arm from Young's grip while trying to punch Young with his right hand. The punch missed and Young unsuccessfully attempted to put Torres in a department-approved carotid restraint. Minx came over to assist Young and all three of them fell to the ground.

Young and Minx ordered Torres multiple times to roll over on his stomach and put his hands behind his back. He refused and resisted by flailing his arms and legs. Minx used his radio to call for back up because Torres was resisting and a crowd was forming. Young and Minx forced Torres onto his stomach. Sergeant Patrick Vinson, who was in full uniform, arrived in a marked police van as Young and Minx managed to handcuff Torres. Young and Minx carried Torres to the police van as he continued to resist by kicking

5

and wiggling. Vinson opened the back doors of the police van and Torres told Vinson, "Sergeant, you're a punk." As Young and Minx lifted Torres to put him into the van, Torres put both feet on the rear bumper and pushed his weight back at Young and Minx. Torres taunted them by saying, "Fuck you. I'm not going in there. You're going to have to work harder to get me in there. Come on. Use your strength." Young, Minx, and Vinson put Torres on the ground and called for more units to cover them given Torres's continued resistance and the very large crowd that had formed around them. While Torres was on the ground, Torres kicked Vinson several times, including a kick with both feet to Vinson's chest that caused him to fly back a couple of feet. Finally, they got Torres into the van. The entire incident lasted about eight minutes.

Nearly eight months later, 61–year–old Hikmat Daoud was on duty as a security officer, in full uniform, at the Bay Point Apartments located at 3866 Ingraham Street in San Diego. Around 10:45 p.m. that night (December 15, 2011), Daoud received a noise complaint from a first floor tenant in building 14. Daoud walked toward building 14 and heard very loud music coming from apartment 206, which was Torres's studio apartment. As Daoud was walking, he saw Torres drinking beer on his balcony, but it did not appear that Torres saw him. Daoud walked up the staircase to the second floor. As Daoud approached Torres's apartment, he saw Torres grab a bike with a small motor that was near his apartment door and take it inside his apartment. Daoud believed Torres saw him and ignored him.

When Daoud arrived at the door to Torres's apartment, the music was still very loud. Daoud knocked on the door and there was no response. Daoud assumed Torres could not hear him knocking based on the loudness of the music, so he used his torque light to knock on the door. From the other side of the door, Daoud heard Torres say, "Who the fuck is it?" Daoud said he was security doing his job, that he had received a complaint about his loud music, and asked Torres to turn his music down. Torres responded, "Get the fuck out from my door. This is my apartment. I can do whatever I want." Daoud responded that Torres did not have to open the door, but that he needed to lower the volume of the music. Daoud did not hear the music being lowered or any response. Torres opened the door and told Daoud to "get the fuck from here." Daoud said that he was going to call the police department. Torres responded, "Fuck you and the police" and closed his door.

Daoud stepped back from the door and called the police. During the call, Daoud described Torres as a "very drunk" big man who was over six feet tall, heavy, in his 20s, with a shaved head. The dispatcher asked Daoud to

16cv0870-MMA (AGS)

stay on the line and ask the resident nicely to lower the music while letting him know Daoud was speaking to the police. Daoud knocked on the door. Torres said through the door, "You again, motherfucker, security?" Daoud told Torres he was on the phone with the police, they could hear everything, and Torres had to turn down the music or the police would be coming. Torres opened the door and his unleashed dog jumped at Daoud. Torres grabbed the dog by the tail, threw it inside the apartment, and told Daoud to get away. By the time the call to the police concluded, Torres had gone back inside his apartment. Daoud walked to Grand Avenue and waited for the police.

SDPD Officers Donald Meeks and Francis Minton, who were both in full uniform and had received radio calls about a noise disturbance at the apartments, arrived in separate marked police cars soon after receiving notice of the disturbance. Daoud led Meeks and Minton to the second floor hallway of building 14 and they had Daoud wait in the hallway as they approached Torres's apartment door. The music coming from Torres's apartment was still very loud. Minton approached the door. Meeks stood beside her. Minton covered the peephole and knocked on the door with her hand and got no response. She then knocked on the door with her flashlight. Torres opened the door. Torres had both of his fists clenched, appeared angry, and had a smirk on his face. Minton was extremely friendly and told Torres there had been a noise complaint and he just needed to turn the music down. At that point, Torres's black dog, a Rottweiler mix, starting [sic] walking toward Minton's feet. Minton told Torres his dog was getting out and Meeks told Torres to "get ahold" of his dog. Torres grabbed the dog by the tail with his right hand, picked it up, and threw it against the wall behind him inside the apartment. Minton, extremely shocked, yelled at Torres, "Oh my gosh, what are you doing." Torres said, several times, "You want some, get some."

Meeks stepped in between the 5'8" and 124 pound Minton and Torres, who was much larger than her at 6'2" and 260 pounds. Torres began closing his door, but Meeks told Torres he was under arrest (for the felony of abusing his dog) and used his left shoulder to block Torres from closing the door. Both Meeks and Torres pushed against the door until Torres let go and Meeks stumbled forward. As Meeks stumbled forward, Torres landed a "sucker punch" to Meeks's nose that caused it to bleed profusely. Meeks went down and Torres used both hands to throw a flurry of eight to 15 punches to Meeks's head.

Minton began punching Torres and used her lapel microphone to call out "cover now" for the immediate assistance from other officers. Torres

knocked Minton to the ground with a punch to her head and punched her several more times when she was down, rendering her briefly unconscious.

Meeks attempted to get up, but stumbled over the prone Minton and fell against the door of another apartment across the hallway. Torres dove out of his apartment and resumed punching Meeks. Meeks pushed Torres off of him, stood up, and began trading punches with him as Minton regained her senses and stood up. Minton deployed her taser to Torres's midsection and used her baton to strike Torres several times in his upper torso, but neither had any effect. Minton's taser was knocked to the ground. Meeks deployed his taser and struck Torres in his chest with both prongs "in full arc," but Torres pulled off the prongs. Torres appeared to see Minton's taser on the ground. Meeks told Torres to not "even think about" picking up Minton's taser, and Meeks and Minton drew their guns. Torres stepped back into his apartment and slammed the door shut.

The resident of a neighboring apartment gave Meeks a towel to staunch the profuse blood flow from his nose. Minton told Daoud she had radioed for help and asked him to go to the front of the complex on Ingraham Street to show arriving officers where the apartment was located. Daoud walked to the front of the complex and many officers and an ambulance arrived. The ambulance took Meeks and Minton to the emergency room at Scripps Memorial Hospital.

At 10:58 p.m. that same night, Daniel Neifer, a SDPD officer in full uniform who was on patrol, responded to Minton's "cover now" radio call. Neifer and Officer Fish responded to the apartment a couple of minutes later. Meeks had been moved away, Minton appeared "frazzled," and Torres's apartment door was shut. SWAT was called out and Neifer and Fish were designated to arrest Torres after SWAT finished its mission. The SWAT team came out and spoke to Torres from the ground level in the courtyard area. Torres stood on his balcony with a bottle of beer in one hand, and a big knife in the other hand. Torres swore at them, threatened to injure them as he had the other officers, and dropped the knife from the balcony. After just under two hours, the SWAT team of four to five officers made entry into Torres's apartment and took custody of him. Once the SWAT officers had Torres outside, Torres resisted their attempt to put him into handcuffs.

The SWAT officers passed Torres over to Neifer and a SDPD officer named Neilson in the hallway. Neilson was involved because Fish could not get around to Torres's other side. Torres refused to move as directed, and physically pulled away and resisted when Neifer tried to pull him. Neifer and

Neilson applied an arm bar and Torres moved down the stairs. When they got Torres to a police car, he refused to get into it. It took the two officers pushing Torres and another officer pulling him from the other side to get him into the police car.

On the drive to police headquarters, with Fish driving and Neifer in the passenger seat, Torres told Neifer, "You better hope I don't see you in your uniform or you'll be sorry. I'm at a point where I don't give a shit about anything anymore."

Lloyd Sentinella, the lead investigator for the SDPD, gave Torres his *Miranda* rights at police headquarters while Torres was in the police car. After Torres, who appeared to have been drinking alcohol, waived his rights, Sentinella questioned him. Torres said that after he had come home that night, he drank six beers and smoked some marijuana. He said the officers were just at the wrong place at the wrong time because they prevented Torres from trying to relax. Torres also said, however, that the officers had "swung" at his dog and he was not going to let that happen and "it was on" at that point. Torres admitted to punching both officers, but said the entire fight was inside his apartment and not in the hallway. Torres said he was tasered twice, but it did not have any effect. Torres said that the incident ended when he closed the door on both officers. Torres denied ever having a knife.

Meeks suffered multiple fractures to his nose, a fractured septum, two chipped teeth and a broken finger. He needed surgery and other medical intervention, missed three months of work, and continued to have memory problems. Minton suffered contusions to the right side of her head and neck, a mild concussion, and a cracked molar that may have caused "cracked tooth syndrome." Minton needed dental intervention of $3,600, missed 30 days of work, and had many lingering effects from the beating.

Defense

Torres testified that he had a bachelor's degree in business and a master's in accounting and he worked for the United States Navy as a civilian. As to April 24, 2011, Torres said that around 1:00 a.m., after drinking two beers over three hours at a bar, he rode his bicycle to go home. A person, who said nothing to Torres, grabbed him and made him lose balance and straddle his bike. Torres said, "What the fuck are you doing?" He then realized it was a police officer after seeing his badge. The officer (Young), said "I want to talk to you," and Torres responded, "You don't have to grab me." Young did not respond and Torres asked him twice to remove his hand, but he did not do

so. Torres pulled away from Young and another officer, Minx, came over as Young put Torres in a chokehold. They all then fell to the ground and Torres hit his head. Torres claimed he did not remember anything else until he asked that his handcuffs be loosened near the county jail.

As to the apartment confrontation, Torres testified he received notification that afternoon he got a new position working for the U.S. Department of State auditing local government agencies. Torres went home and took his dog, Odie, to puppy beach in Pacific Beach. He then went to the liquor store and got a six pack of beer to celebrate his new position. Torres got home, drank a beer, and began preparing a meal. He left his apartment at 10:00 p.m. and left his music on, bought another six pack from a liquor store half a block away, and returned to his apartment. The security guard was at Torres's door when he returned. Torres told the security guard to get out of his way, went into his apartment, and shut the door.

Torres said that when he opened the door to the security guard and the police, the police told him they were there on a noise complaint. Odie tried to run out, he grabbed Odie by the tail, and the dog went under the bed. Torres denied throwing the dog. Torres then attempted to shut the door. Minton blocked the door and Meeks kicked the door open, said, "that's no way to treat your dog" and punched Torres in the face. Torres then, to defend himself, struggled with Meeks and Minton, including trading punches and Torres being shocked with a taser.

Torres communicated with the police from his balcony for about two hours before they entered and arrested him. He had a knife on the balcony because he had left it on the barbeque grill when he was cooking chicken.

On cross-examination and recross-examination, Torres said that when he left at 10:00 p.m., he did not buy more beer, he had approximately three beers left of the original six pack, and he bought ice cream. He smoked marijuana that night, inhaling a couple of times, and claimed to use it for medicinal purposes. Torres was relaxed, but not "stoned." The officer started things first by coming into his apartment and punching him. His reaction was self-defense. He did not wish to hurt anyone. Torres claimed that post-traumatic stress disorder (PTSD) had an effect on his behavior after he was attacked by the officer. Torres also claimed that he did not recognize Minton and Meeks as officers during the initial contact or the struggle. He denied saying, "want some, get some." He did not realize they were officers until he saw Meeks's SDPD cap in his apartment. He punched Meeks in the face four times after feeling the effects of the taser and pushed Minton off his back. He

16cv0870-MMA (AGS)

was on his balcony for two hours and threw down Meeks's cap and a knife. While officers were attempting to talk to him on his balcony he went inside and "did the dishes." The police then hit Torres's balcony with a pepper spray ball.

On redirect examination, Torres testified that he experiences short term memory loss on occasion. Torres stated that although he does not have a medical marijuana card, he smokes marijuana because he has "post traumatic stress." Torres also testified that he told Sentinella that "they swung on me, dawg," using the slang term "dawg" instead of "dog."

Prosecution Rebuttal

Steven Woodrow, a long time SDPD officer, spoke with Torres while he was on the balcony at the request of Vinson. Six to eight officers and a sergeant were present when Woodrow arrived. Woodrow calmly spoke with Torres from the courtyard behind his apartment to try to have him surrender peacefully. Torres drank more than one beer on the balcony. At one point, Torres dropped a knife out of his waistband onto the ground. No one was hit by the knife. Torres went back and forth between the balcony and the inside of his apartment. Torres vacillated between showing remorse by asking about Meeks's condition, and being angry and defiant to opening his door for the police. At one point, Torres said that if any officers came into his apartment, they would "meet my nine." This led Woodrow to believe that Torres had a nine-millimeter gun in the apartment.

Vinson was the on scene supervisor on the night in question. There were at least 10 officers there when Vinson arrived. About 15 minutes before Torres was arrested, the emergency negotiations team spoke with Torres. No taunts were directed at Torres. Pepper balls were deployed onto Torres's balcony to distract and disorient Torres to make it safer to arrest him. A SWAT entry team of roughly seven officers and a K–9 used a key to enter the apartment, found Torres standing in the middle of the apartment, and ordered him to get down on the floor. Torres did not get down and said "hostile" words. Officers struggled with Torres before putting him in custody. Torres was arrested without a warrant based on the "exigent circumstance" of his violent behavior and his insinuations that he was armed.

A recording of a jail phone conversation between Torres and another person two days after the incident was played for the jury and later admitted into evidence. During the recording, Torres, when describing what occurred at his apartment, never said that he was struck by the officers.

16cv0870-MMA (AGS)

Defense Surrebuttal

Brian Goldberg, an SDPD lieutenant, gave an interview with a television station the night of the incident where he said Torres threw his dog at Meeks and Minton. Goldberg testified, however, there were between 20 to 40 officers at the location that night and he did not know where he got the information about Torres throwing his dog at Meeks and Minton. He did not recall specifically being told that information by Meeks and Minton.

Torres testified he was talking to his cousin in the jail interview recording. Torres said, as to apartment confrontation, his adrenaline was going (because of) "post-traumatic stress disorder." He also testified that, "with post-traumatic stress disorder, I'm going to defend myself." Again, in talking about the recording, Torres said his cousin said he needed to let the world know about PTSD.

Lodgment No. 9, *People v. Torres*, No. D063150, slip op. 3-14 [Doc. No. 15.18 at 3-14].

## DISCUSSION

Petitioner alleges that his Sixth Amendment rights were violated by the denial of the three motions to replace his appointed trial counsel he made before, during, and after trial, based on a complete breakdown in the attorney-client relationship (Claim 1); by ineffective assistance of trial counsel in failing to introduce relevant evidence in numerous respects, failing to present a PTSD defense, use of alcohol during trial, conceding his guilt during closing argument, and a conflict of interest (Claim 2); and, by ineffective assistance of appellate counsel due to counsel's failure to file a petition for a writ of certiorari, and failure to raise an ineffective assistance of trial counsel claim on direct appeal regarding trial counsel's conflict of interest and use of alcohol during trial (Claim 3). *See* Pet. at 23-37 [Doc. No. 1 at 25-39].

Respondent answers that habeas relief is unavailable because the adjudication of Claims 1 and 2 by the state court is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and because Claim 3 is unexhausted and without merit. *See* Ans. Mem. at 15-24 [Doc. No. 14.1 at 20-29]. Petitioner replies that Claim 3 was presented in his first California Supreme Court habeas petition, and is

therefore exhausted; an evidentiary hearing is necessary on his conflict of interest claim; and, he was prejudiced by the cumulative effect of trial counsel's errors. *See* Traverse at 4-8 [Doc. No. 16 at 4-8]. Petitioner further contends that Claim 3, if not exhausted by his first habeas petition in the state supreme court, was exhausted in his second petition in that court. *See* Doc. No. 21.

## A. Standard of Review

In order to obtain federal habeas relief with respect to claims which were adjudicated on their merits in state court, such as Claims 1 and 2 here, a federal habeas petitioner must demonstrate that the state court adjudication of the claims: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d). Even if section 2254(d) is satisfied, or does not apply, a petitioner must still show that a federal constitutional violation occurred in order to obtain habeas relief. *Fry v. Pliler*, 551 U.S. 112, 119-22 (2007); *Frantz v. Hazey*, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. Relief under the "unreasonable application" clause of section 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question."

*White v. Woodall*, 572 U.S. ___, 134 S.Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). In order to satisfy section 2254(d)(2), a petitioner must show that the factual findings upon which the state court's adjudication of his claims rest are objectively unreasonable. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

When a federal habeas court addresses the merits of a claim which has not been adjudicated on the merits in state court, such as Claim 3 here, *de novo* review is required. *Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002). Under that review, "state court judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that [his] detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc). To the extent the state court's reasoning on related claims is relevant, it must be considered. *See Frantz*, 533 F.3d at 738 (holding that even if the state court does not address the constitutional issue, where the reasoning of the state court is relevant, that reasoning must be part of a federal habeas court's consideration even under a *de novo* review).

## B.    Claim 1

Petitioner alleges in Claim 1 that his rights protected by the Sixth Amendment were violated by the denial of three motions to relieve his appointed public defender which he made before, during and after trial pursuant to *People v. Marsden*, 2 Cal.3d 118, 123 (1970) (holding that a defendant represented by appointed counsel or the public defender may request that the court discharge the attorney and substitute new counsel if

the defendant's right to counsel would be substantially impaired by continuing with the original attorney). *See* Pet. at 23-24 [Doc. No. 1 at 25-26]. Petitioner claims that the trial and appellate courts erred in finding that his disputes with counsel merely involved disagreements over trial tactics, and therefore did not provide a basis to replace counsel. *See* Pet. Ex. D at 4-11 [Doc. No. 1 at 90-97]. Petitioner argues that the combination of the uncertainty as to trial counsel's ability expressed by the judge when the judge and her staff smelled a strong odor of alcohol on counsel's breath during trial; his own repeated efforts to bring to the attention of the trial judge his breakdown in communication with counsel; and, the fact that counsel spent very little time with him despite his desperate efforts for communication which included petitioning county, state, and federal officials for help in contacting counsel, shows it was unreasonable to find their disputes were merely over trial tactics. *Id.*

Respondent answers that Petitioner has failed to identify any cause for the removal of defense counsel, including any cause related to alcohol use, and he therefore cannot show that the state court denial of Claim 1 on that basis is contrary to, or involves an unreasonable application of, clearly established federal law. *See* Ans. Mem. at 15-17 [Doc. No. 14.1 at 20-22]. Petitioner replies that the trial judge erred in accepting counsel's word as an officer of the court that she had not been drinking after the judge and her staff noticed a strong odor of alcohol on counsel's breath, and that defense counsel "left working for the San Diego Public Defenders office shortly after the petitioner's case potentially being alcohol related." Traverse at 4-5 [Doc. No. 16 at 4-5].

Petitioner presented this claim to the California Supreme Court in his petition for review. *See* Lodgment No. 10 at 4-11 [Doc. No. 15.19 at 10-17]. The petition was summarily denied without citation of authority or a statement of reasoning. *See* Lodgment No. 11 at 1 [Doc. No. 15.20 at 1]. The claim was also presented to the state appellate court on direct appeal. *See* Lodgment No. 6 at 17-36 [Doc. No. 15.15 at 26-45]; Lodgment No. 8 at 1-13 [Doc. No. 15.17 at 9-21]. The claim was denied on the merits in a written opinion affirming the convictions. *See* Lodgment No. 9, *People v. Torres*, No.

D063150, slip op. at 14-25 [Doc. No. 15.18 at 14-25].

There is a presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991). The Court will look through the silent denial by the state supreme court to the appellate court opinion on direct appeal, and apply the provisions of section 2254(d) to that opinion with respect to Claim 1. *Id.* The appellate court stated:

> Torres contends the superior court erred in denying his three *Marsden* motions. The People argue there were only two *Marsden* motions. However, this disagreement is immaterial as the People address all three instances where Torres questioned the effectiveness of his counsel: September 17, 2012; September 19, 2012; and November 2, 2012. For purposes of our review, we consider all three of these requests and find no error.

> A. Background
> 1. *September 17, 2012*

> Before trial began on September 17, 2012, Torres made a *Marsden* motion and the prosecutor left the courtroom. Torres complained that he had not spoken to defense counsel, a deputy public defender, from the time she was assigned the case in May 2012, until August 17, 2012. He claimed his attorney had not returned Torres's numerous calls and e-mails to her. Torres said he met with defense counsel in her office on August 17, 2012. Torres stated that defense counsel had not reviewed the case thoroughly because she thought Torres had "sucker punched" the female officer. Torres also said they spent two hours discussing his case. During that two-hour discussion, they discussed evidence that Torres wanted introduced at trial and arranged for Torres to type his official statement on what happened the night of December 15, 2011. Torres said on Friday the following week he e-mailed his official statement to defense counsel and she said she would call Torres that day, but failed to do so. Torres said that on another occasion he called defense counsel and she said she would call Torres back the next day, but never did. On another occasion he called her and she said she would call back in 45 minutes, but failed to do so.

> Torres said that over the next two weeks, he contacted defense counsel's supervisor, the county board of supervisors, a state representative, and federal congress members to try to get in contact with defense counsel.

Torres claimed his efforts prompted a five-minute call from defense counsel in which she told Torres she had too many cases, Torres's case was not the only one she had, and she was working on a Hell's Angel's case. Torres also said that defense counsel sent him an e-mail the Friday before the September 17, 2012 hearing about Torres's next door neighbor witnessing what happened through a peephole on December 15, 2011.

Torres further complained that he wanted defense counsel to subpoena Goldberg to testify about his media statement that Torres had thrown his dog at Meeks and Minton during the apartment altercation. Torres also wanted it introduced into evidence that Meeks attempted to adopt his dog after that night, and that his neighbor had made previous noise complaints about Torres.

Defense counsel stated that she was assigned the case on May 11, 2012, and Torres told her that day he wanted to take responsibility for what he did and go to Veterans Court, where a plea of guilty was required. Based on what Torres told her, defense counsel sent information to Veterans Court and assumed the case was being worked on there. She did not tell Torres she had too many cases, but did tell him that she had cases coming up before his. She also told Torres the Hell's Angel's case was not hers, but that case held her up the morning it was heard. Also, defense counsel learned from Torres at the readiness conference on July 23, 2012, that he did not want to enter a plea, and thus would not be in Veterans Court. That day, defense counsel told Torres to come to her office to discuss the case, but he told her he could not do so because he did not live in San Diego.

On the jury trial date, defense counsel asked for a one-month continuance. Defense counsel said she never told Torres he "sucker punched" a woman, but that it was claimed that Torres had punched Meeks. Defense counsel stated that she had a telephone conversation with Torres on September 6, 2012, and he told her he was satisfied with her representation. However, on September 10 or 11, Torres said he wanted a *Marsden* hearing.

Defense counsel said that the "biggest problem" was that Torres wanted to "run the case." He had sent messages to defense counsel on whom to subpoena, what questions to ask, and who and how she was supposed to cross-examine. Defense counsel had told Torres that he only had the right to decide whether to go to trial, and the right to decide whether he would testify, and that everything else was up to defense counsel. Defense counsel stated that she did not think the dog throwing evidence or the dog adoption evidence was relevant at trial, she had an investigator trying to interview the neighbor who

witnessed Torres punch Meeks, she had reviewed all the relevant statements and evidence for trial, and she was ready for trial.

Torres disputed that he had spoken with defense counsel between May 11 and August 17, 2012, said defense counsel's attitude was to "blow (him) off," and confirmed he told defense counsel he wanted to go to Veterans Court and that she had Veterans Court contact him. Defense counsel also confirmed that Torres's opinion differed from defense counsel's as to relevance of the dog throwing and dog adoption evidence. Torres said he had "lost faith" in defense counsel after she did not contact him following their meeting on August 17, 2012.

The trial court elicited from defense counsel that she was a very experienced defense attorney, having done approximately 120 trials over 23 years. The trial court told Torres that a public defender has a full caseload with many clients and would not always be able to call Torres back. The trial court also told Torres that defense counsel had in fact met with him for several hours, had e-mailed and called him, and was ready for trial. Torres and the trial court then further discussed the evidence he wanted admitted, and the court told Torres that if he wanted certain evidence to be known, he had the right to testify. The trial court denied the *Marsden* motion.

## 2. *September 19, 2012*

During trial, at the start of the morning session on September 19, 2012, there was a discussion in chambers outside the presence of the prosecutor. Torres repeated that he wanted Goldberg to testify about the accusation that Torres threw his dog at Meeks and Minton. Torres said he also wanted defense counsel to play videotapes of him being taken into custody on December 15, 2011, because it showed officers being aggressive with him. Defense counsel stated she did not want to play the videotapes for the jury because she did not think it was relevant and because it made Torres look aggressive and "sort of dangerous." Defense counsel further stated that it had already been established by Meeks's testimony that Torres did not throw his dog at Meeks and Minton, and defense counsel was certain Minton would testify the same. During further discussion, the trial court indicated that Torres was arguing things that were within the strategic calls of defense counsel, defense counsel was correct in her assessment of the evidence, and Torres could choose to testify to tell his side of what happened.

Torres then resumed his complaint that his constant attempts to contact defense counsel went unanswered, and asked if the videotapes would be

played if he represented himself. The trial court said it was too late for Torres to represent himself given that it was "midtrial." After further discussion, defense counsel noted to the trial court that Torres had made a motion to represent himself, and she had seen other cases where defendants had dismissed their attorney midtrial. Torres complained defense counsel did not want to represent him because she avoided, and refused to return, his phone calls.

The trial court noted that it had already been established that Torres met with defense counsel for several hours and there had been telephone contact. The trial court asked Torres if he was specifically requesting to represent himself. Torres responded, "No, Your Honor, because that would lead to a mistrial and the appeals process would be—be ruined, you know. (¶) And I just want the videos represented. That's what I'm appealing." The trial court then asked defense counsel to reconsider the videotapes if in her view they corroborated Torres's statements that the officers used excessive force to apprehend him, and defense counsel agreed.

We note that during the September 19, 2012 in chambers discussion, Torres did not request that his appointed counsel be replaced. As such, the trial court never ruled on any *Marsden* motion on September 19.

### 2. *November 2, 2012*

On November 2, 2012, after the trial and before the date of sentencing, there was a hearing in the courtroom outside the presence of the prosecutor. Torres complained that defense counsel had failed to present the pretrial testimony of the officers and other witnesses. The trial court responded: "I don't know what you're talking about. I had the preliminary hearing transcript, sir. I reviewed all of that. . . . The witnesses were all impeached with any discrepancies in their preliminary statements. The jury had all that information. They listened to you testify for a very long period of time and heard your side of the story, sir, and they found you not credible, and they made a call on the case." The trial court pointed out that defense counsel argued vigorously to the jury that Torres was acting in self-defense. The trial court also said Torres could not change the facts that it was "clear as a bell" that Torres was a "man out of control" on that night who beat up two officers without provocation. The trial court further stated that given those facts, and the fact that Torres was pacing on a balcony with a knife and taunting the officers, it was an "uphill battle" for defense counsel. The trial court then noted Torres's agitation during the trial, and said, "I don't know what is making you tick, sir, but it's obviously some very serious issues."

Torres again expressed his frustration with defense counsel's performance, particularly with regard to discrepancies in testimony. The trial court repeated that defense counsel brought out any inconsistencies, including where the dog was located, and vigorously argued self-defense to the jury. Referring to defense counsel, the trial court stated, "based on what has been said, I don't find a basis to relieve her."

## B. Law and Analysis

A trial court has broad discretion to grant or deny a motion. When the court denies a *Marsden* motion, we review the denial under an abuse of discretion standard. A denial is not an abuse of discretion unless the defendant shows the failure to replace the appointed attorney would "substantially impair" the defendant's right to competent counsel. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085.) A trial court's discretionary decision will not be disturbed on appeal if there exists "'a reasonable or even fairly debatable justification, under the law, for the action taken.'" (*Gonzales v. Nork* (1978) 20 Cal.3d 500, 507.) Consequently, we will interfere with the trial court's exercise of discretion only when we conclude that under all the circumstances, viewed most favorably in support of the trial court's action, no judge could have reasonably reached the challenged result. (*Smith v. Smith* (1969) 1 Cal.App.3d 952, 958.)

Under the *Marsden* standard, a defendant must show that appointed counsel is not providing competent representation or that there is an irreconcilable conflict such that ineffective representation is likely to result. (*People v. Dickey* (2005) 35 Cal.4th 884, 917.) However, "a defendant does not have the right to the appointment of new counsel absent a clear showing of inadequate representation." (*People v. Silva* (1988) 45 Cal.3d 604, 622.) The trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. (*Marsden*, *supra*, 2 Cal.3d 118, 124.) A trial court may not deny a request for substitution of attorneys without giving the defendant the opportunity to explain his reasons through presentation of argument and evidence. (*Ibid*.) "All *Marsden* held was that a defendant is denied a fair trial when the trial court refuses to hear enumerated specific examples of inadequate representation." (*People v. Huffman* (1977) 71 Cal.App.3d 63, 77.) When the defendant is afforded an opportunity to state the reasons for discharging an appointed attorney, the trial court's decision to allow a substitution of

attorney is discretionary unless the defendant has shown that failure to order substitution is likely to result in constitutionally inadequate representation.

Here, the trial court was within its discretion in concluding that Torres did not make a showing sufficient to justify the discharge of his appointed counsel. On three occasions the trial court heard Torres's complaints about his appointed counsel.

Ultimately, the record reveals Torres was unhappy with his counsel for two reasons. First, Torres believed that his appointed counsel did not sufficiently communicate with him. Second, Torres disagreed with defense counsel regarding trial strategy. Neither contention shows the trial court abused its discretion in denying Torres's *Marsden* motions.

The record does show some communication gaps when Torres first received appointed counsel. However, this communication problem occurred because of a misunderstanding between Torres and his counsel. Torres confirmed that when he first met defense counsel in May 2012, he asked to be referred to Veterans Court. Therefore, defense counsel sent information to Veterans Court, believing Torres was headed there. When defense counsel learned in July 2012 that Torres had changed his mind and was not going to Veterans Court, she acted quickly and appropriately to ensure Torres was adequately represented. She obtained a trial continuance and met with Torres on August 17, 2012. Torres acknowledged that on that date he discussed his case with defense counsel for two hours and that she arranged for him to type his official statement of what occurred on December 15, 2011. From that time until trial on September 17, 2012, defense counsel had an investigator try to interview the neighbor who saw Torres fighting with Meeks, and sent Torres an e-mail about that neighbor. Also, defense counsel stated that she spoke with Torres on the telephone on September 6, 2012, and he expressed satisfaction with her representation. Nevertheless, four or five days later, he requested a *Marsden* hearing. While Torres disputed what, if any, conversations took place between him and defense counsel from May 11 to August 17, 2012, Torres never denied that he spoke with defense counsel on September 6, 2012, and expressed satisfaction with her representation.

On this record, we cannot say the trial court abused its discretion in denying Torres's *Marsden* motions based on Torres's assertion that defense counsel failed to communicate regularly with him. Torres and defense counsel disagree regarding the number of times they spoke and the duration and content of those conversations. To the extent that the trial court made a credibility determination in believing defense counsel instead of Torres, we

16cv0870-MMA (AGS)

will not second guess the trial court in this matter. Simply put, despite some communication issues, Torres has not shown that defense counsel was not providing competent representation or that there was an irreconcilable conflict such that ineffective representation was likely to result. (*People v. Dickey*, supra, 35 Cal.4th at p. 917.)

Likewise we are not persuaded that Torres has shown an irreconcilable conflict based on his complaints that defense counsel (1) refused to show the security video of him being taken from his apartment; (2) did not effectively cross-examine witnesses with inconsistencies between their trial testimony and preliminary hearing testimony; and (3) disagreed with him about calling Goldberg as a witness. As a threshold matter, we observe that all of Torres's concerns involve trial strategy. Disagreements over trial strategy do not "'"constitute an 'irreconcilable conflict'" unless they portend a complete breakdown in the attorney-client relationship.'" (*People v. Clark* (2011) 52 Cal.4th 856, 912; see *People v. Freeman* (1994) 8 Cal.4th 450, 481 (defendant's distrust of counsel who suggested he plead guilty did not state an adequate basis for substitution of counsel).) Trial counsel is the person responsible for making all but a few of the tactical trial decisions. (*People v. Carpenter* (1997) 15 Cal.4th 312, 376.) The fact that the defendant does not wish to follow counsel's advice or chooses not to listen to counsel does not require the trial court to replace counsel. (*People v. Smith* (2003) 30 Cal.4th 581, 606; *Clark*, supra, 52 Cal.4th at p. 918.)

Here, Torres clearly is complaining about tactical decisions made by his trial counsel: what evidence to introduce, the cross-examination of witnesses, and which witnesses to call at trial. Moreover, except for defense counsel's decision not to seek admission of the video of Torres being arrested, Torres's "complaint" about defense counsel's tactical decisions is without any support in the record. Torres has not pointed out, by citing to the record, how his trial counsel failed to cross-examine witnesses with discrepancies from the preliminary hearing. Also, the witness Torres wanted to testify (Goldberg) actually did. Again, on this record, Torres has not shown there was a complete breakdown in the attorney-client relationship resulting in an irreconcilable conflict. (See *People v. Clark, supra*, 52 Cal.4th at p. 912; *People v. Crandell* (1988) 46 Cal.3d 833, 859-860.) [Footnote: To support his position that he was "embroiled in such an irreconcilable conflict" with his trial counsel that she had to be replaced, Torres insists he appeared "agitated" throughout trial. The only support in the record for Torres's claim is the comment by the trial court during the last *Marsden* hearing about Torres's "agitation throughout the whole trial." Torres has not cited to any other portion of the record indicating that he appeared agitated during trial or the jury noticed he was

agitated during trial. We do not know if Torres appeared agitated to the jury or if he was agitated by his trial counsel's representation during trial. For example, during the sentencing hearing, Minton commented that Torres "smirked and smiled at me" while she was in court during Torres's trial. Without support in the record, we do not consider Torres's alleged agitation during trial as support for his claim that he was experiencing such an irreconcilable conflict with his counsel that ineffective representation resulted. (Cf. *People v. Neilson* (2007) 154 Cal.App.4th 1529, 1534 ("The appellant has the burden of furnishing an appellate court with a record sufficient to consider the issues on appeal. (Citation.) An appellate court's review is limited to consideration of the matters contained in the appellate record.").)]

Lodgment No. 9, *People v. Torres*, No. D063150, slip op. at 14-25 [Doc. No. 15.18 at 14-25].

Clearly established federal law provides that the Sixth Amendment requires an appropriate inquiry into the grounds for a *Marsden* motion. *Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc); *Hudson v. Rushen*, 686 F.2d 826, 829 (9th Cir. 1982) ("The trial court must take the time to conduct such necessary inquiry as might ease the defendant's dissatisfaction, distrust, and concern."). "The [Sixth] Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." *Schell*, 218 F.3d at 1025-26 (internal quotation marks omitted). Petitioner can demonstrate that he was denied his Sixth Amendment right to the choice of counsel by showing: (1) he made a timely request for substitution of counsel which would not have caused undue delay or inconvenience; (2) the trial court failed to make an adequate inquiry into his complaints; and (3) the conflict between him and his attorney was so great that it resulted in a total breakdown in communication which prevented an adequate defense. *United States v. Mendez-Sanchez*, 563 F.3d 935, 942 (9th Cir. 2009).

Petitioner first argues that the appellate court ignored the trial judge's inquiry into defense counsel's alcohol consumption during trial, an inquiry which Petitioner contends

was inadequate because the trial judge merely took counsel's representation as an officer of the court that she had not been drinking. *See* Pet. at 23 [Doc. No. 1 at 25]. On the morning of the second day of trial, a Tuesday, just before jury voir dire resumed, the following exchange took place in the trial judge's chambers:

> **The Court**: I'm not sure how to deal with this issue. I haven't had this come up in 22 years, but I do feel concerned enough about it that I wanted to just put this on the record. Ms. Wilson [defense counsel], yesterday when we were at sidebar in the afternoon, I did smell a very strong odor of alcohol. And my staff has been reporting this to me --
>
> **Ms. Wilson**: I'm surprised.
>
> **The Court**: -- this morning and through yesterday. Obviously, as the overseer of the trial and in light of the *Marsden* which was filed yesterday and some of the issues discussed in that, which I'm not going to go over in the presence of Mr. Romo [the prosecutor], I do have a concern about whether you are consuming alcohol during this case.
>
> **Ms. Wilson**: Absolutely not. I mean at lunchtime I went; I got a croissant sandwich. I think I had ginger ale or something like that. I can assure you I didn't.
>
> **The Court**: Okay. So you are saying you have had no alcohol in the last two days?
>
> **Ms. Wilson**: Oh, I might have had some -- like a glass of wine like Sunday night or something like that, but nothing in the daytime where -- you know.
>
> **The Court**: Okay.
>
> **Ms. Wilson**: I don't know if it's my cologne. I don't know I use eucalyptus mint -- what is that stuff called -- Listerine or when I brush my teeth this morning.
>
> **The Court**: Okay. So you are prepared to go forward, then, today?
>
> **Ms. Wilson**: Yes.
>
> **The Court**: I'm sorry for having to bring this up.

**Ms. Wilson**: It's embarrassing.

/ / /

**The Court**: It is. But you know, I -- I frankly was shocked at sidebar yesterday and --

**Ms. Wilson**: See, that would be weird.

**The Court**: but -- so you're an officer of the court, and if you are telling me that I was mistaken, then I'll leave it at that. Okay. Thank you.

Lodgment No. 4, Reporter's Tr. vol. 2 at 5-6 [Doc. No. 15.5 at 3-4].

Respondent argues that the inquiry into whether defense counsel consumed alcohol during trial was adequate because Petitioner never complained at any point that counsel performed deficiently due to alcohol consumption. *See* Ans. Mem. at 15-17 [Doc. No. 14.1 at 20-22]. Respondent contends that Petitioner has asserted no facts, here or in the state court, which support a finding that defense counsel's performance was affected by alcohol or was deficient due to alcohol consumption. *Id.*

Petitioner argues that the observation by the trial judge and his staff that defense counsel had consumed alcohol, when coupled with his repeated challenges to counsel's performance, should have been sufficient grounds to replace counsel. *See* Pet. at 23-25 [Doc. No. 1 at 25-26]; Pet. Ex. A at 10-11, 20-22 [Doc. No. 1 at 60-61, 68-70]. He contends that defense counsel left the public defender's officer shortly after his trial, speculating that her departure was "potentially . . . alcohol related." Traverse at 5 [Doc. No. 16 at 5].

Petitioner has not identified any aspect of trial counsel's performance which was, or even appeared, to have been impaired by the use of alcohol. Even assuming the trial judge's inquiry was, as Petitioner contends, too accommodating, Petitioner merely speculates that counsel's performance was affected by the use of alcohol and that counsel may have soon thereafter left her job as a result of alcohol use. Speculative and conclusory allegations are insufficient to prove counsel provided ineffective assistance. *Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *James v. Borg*, 24 F.3d 20, 26 (9th Cir.

1994).

Because there was no further mention of the use of alcohol by counsel during trial, or any indication that alcohol may have had any effect on the attorney-client relationship, the trial court's inquiry adequately protected Petitioner's rights. *See Rushen*, 686 F.2d at 829 ("The trial court must take the time to conduct such necessary inquiry as might ease the defendant's dissatisfaction, distrust, and concern."). As discussed below, Petitioner has failed to identify any defect in counsel's performance, alcohol-related or otherwise. Thus, the appellate court's failure to address this concern did not render its adjudication of Claim 1 contrary to, or an unreasonable application of, clearly established federal law, and does not support a finding that it was based on an unreasonable determination of the facts. *See Bonin v. Calderon*, 59 F.3d 815, 838 (9th Cir. 1995) (finding evidence that trial counsel may have been abusing drugs before and during trial irrelevant where there is no showing of deficient representation, because "once an attorney's conduct is shown to be objectively reasonable, it becomes unnecessary to inquire into the source of the attorney's alleged shortcomings.") (citing *Strickland v. Washington*, 466 U.S. 668, 700 (1984)); *see also Richter*, 562 U.S. at 103 ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.")

Petitioner next contends defense counsel failed to spend sufficient time with him preparing for trial. At the first *Marsden* hearing, Petitioner, who was released on bail, said that he had initially retained counsel but could not afford to keep him, so he was assigned a public defender in May 2012. *See* Lodgment No. 5, Reporter's Tr. vol. 1 at 1 [Doc. No. 15.7 at 3]. Petitioner advised the trial court that he had attempted several times prior to the August 17, 2012 trial call to contact counsel by phone and by e-mail after she had been appointed, but only spoke to her for a few minutes while walking into court on August 17 (at which time the trial was set for September 17), and they spent two hours

26

discussing the case in her office later that day.  *Id.* at 1-2 [Doc. No. 15.7 at 3-4].
Petitioner said he expected to speak to counsel again the following week, and when his
messages went unreturned for two weeks he tried unsuccessfully to contact her
supervisor.  *Id.* at 2-3 [Doc. No. 15.7 at 4-5].  He said he then contacted county
supervisors and members of the state and federal legislature, which resulted in a five-
minute telephone call from counsel, and the only other communication he had with
counsel since the August 17 meeting was an e-mail on the Friday before the Monday start
of trial.  *Id.* at 3-5 [Doc. No. 15.7 at 5-7].

Defense counsel advised the court that she first met with Petitioner on May 11,
2012, when she was assigned the case, and Petitioner told her that he was willing to take
responsibility for what he did but wanted the police to also take responsibility, and he
wanted to go to Veterans Court.  *Id.* at 9 [Doc. No. 15.7 at 11].  Counsel said she was in
trial at that time and it took her about a week to send the information to the Veterans
Court, and she assumed they were working on the case.  *Id.*  She found out at a readiness
conference on July 23, 2012 that Petitioner decided he did not want to go to Veterans
Court, so she instructed him to come to her office to discuss the case, but he said he was
unable to come to her office because he no longer lived in San Diego.  *Id.*  Counsel
indicated that she felt Petitioner wanted to run the case and tell her who to subpoena and
how to cross-examine witnesses, and said she informed him that he had the right to
decide whether to go to trial and whether to testify but all other trial decisions were hers.
*Id.* at 10 [Doc. No. 15.7 at 12].  They spoke on the telephone on September 6, 2012, and
Petitioner said he was satisfied with her representation.  *Id.*  A few days later Petitioner
sent her an e-mail which said he wanted a *Marsden* motion and a change of venue.  *Id.* at
11 [Doc. No. 15.7 at 13].

The trial judge explained to Petitioner that defense counsel had nearly 23 years of
experience during which she had conducted well over one hundred trials, and that
Petitioner was not her only client, as she had a full caseload, so he was not entitled to
instant communication with her at his convenience.  *Id.* at 17-18 [Doc. No. 15.7 at 19-

16cv0870-MMA (AGS)

20].  The trial judge also patiently explained to Petitioner the relevance of the evidence he was complaining that counsel had overlooked (discussed in detail below in Claim 2), and obtained an assurance from counsel that she was prepared to go to trial.  *Id.* at 12-23 [Doc. No. 15.7 at 14-25].  Thus, the record does not support Petitioner's allegation that counsel failed to spend sufficient time with him, or that the amount of time they spent together warranted a finding of a breakdown in their relationship so severe as to require replacement of counsel.  The trial court's inquiry adequately protected Petitioner's Sixth Amendment rights.  *Schell*, 218 F.3d at 1025; *Rushen*, 686 F.2d at 829; *see also Richter*, 562 U.S. at 102 (holding that federal "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction.") (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)).

Petitioner next challenges the findings of the trial and appellate courts that because his disagreements with counsel were merely over trial tactics there was no basis to replace counsel.  He argues that he repeatedly brought to the trial court's attention the breakdown in communication between himself and counsel, and repeatedly expressed his belief that counsel was not interested in representing him.  *See* Pet. Ex. D at 4-11 [Doc. No. 1 at 90-97].  He claims that the breakdown in their relationship was obvious, and was demonstrated by his agitation throughout the trial and the fact that counsel spent very little time with him prior to trial despite his desperate efforts at communication which included petitioning county, state and federal officials for assistance in contacting counsel.  *Id.*

As the appellate court correctly found, the trial court conducted adequate inquiries into Petitioner's complaints and satisfied itself that what he perceived as a breakdown in communication or in a lack of interest in representing him, amounted to a disagreement over trial tactics which did not arise from a breakdown in counsel's ability to adequately represent Petitioner.  As discussed in detail below in connection to Petitioner's ineffective assistance of trial counsel claim, the examples Petitioner gave to the trial court in support of his contention that there was a breakdown in their relationship

relied primarily on disagreements regarding the relevance of evidence and a strategic decision whether to offer the evidence. These included a videotape of the SWAT team taking Petitioner into custody ninety minutes after the events for which he was on trial, photographs of Petitioner and his apartment taken that night, his eviction notice which incorrectly stated that he had thrown his dog at the officers, media reports that an officer inaccurately said that Petitioner had thrown his dog at the officers, evidence that an officer may have attempted to adopt his dog after that night, and evidence that an upstairs neighbor had a history of making noise complaints against Petitioner.

As discussed below, Petitioner's allegations of deficient performance with respect to all of those allegations, as well as the allegations of deficient performance not included in the *Marsden* motions (regarding a failure present a PTSD defense, admitting guilt during closing, and conflict of interest), do not support a finding that counsel was constitutionally ineffective. Rather, as explained below, each disagreement regarding the admission of evidence involved sound trial strategy and decisions trial counsel was entitled to make, and Petitioner has failed to show that any alleged instance of deficient performance was prejudicial, individually or cumulatively. Thus, Petitioner has failed to show that the state court violated his clearly established federal constitutional right to an adequate inquiry into his complaints that his relationship with his appointed attorney had broken down to the point where he was not receiving adequate representation. *Mendez-Sanchez*, 563 F.3d at 942; *Schell*, 218 F.3d at 1025-26 ("The [Sixth] Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts.") (internal quotation marks omitted).

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at

103. "If this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents." *Id.* at 102. The Court denies relief as to Claim 1 because the adjudication by the state court is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.

## C.    Claim 2

Petitioner alleges in Claim 2 that his Sixth Amendment right to the effective assistance of counsel was violated because his defense counsel suffered from a conflict of interest arising from her working relationship with the San Diego Police Department in her capacity as president of the San Diego chapter of the NAACP. *See* Pet. at 24-35 [Doc. No. 1 at 26-37]. He contends that the conflict of interest prevented counsel from presenting a "plausible defense" based on "the aggressive tactics used by the San Diego police," from vigorously cross-examining the police officers, and from introducing evidence that his PTSD rendered him more susceptible to such aggressive tactics. *Id.* Petitioner also argues that defense counsel admitted Petitioner's guilt during closing argument, and was deficient in refusing to admit photographs of his apartment and his injuries, evidence that a police officer attempted to adopt his dog, a video showing him being taken into custody by the SWAT team, previous noise complaints by an upstairs neighbor, his eviction notice which falsely stated that he had thrown his dog at the officers, and media reports that an officer on the scene that night falsely stated that he threw his dog at the police. *Id.*; Pet. Ex. A at 15-17 [Doc. No. 1 at 63-65].

Respondent answers that the state court correctly found that the alleged conflict of interest by itself was not evidence of ineffective assistance of counsel, but was based on speculation that defense counsel's executive position with the local chapter of the NAACP resulted in a good working relationship with the police. *See* Ans. Mem. at 17 [Doc. No. 14.1 at 22]. Respondent contends that Petitioner has not shown that his defense counsel provided constitutionally deficient representation in any respect, and

16cv0870-MMA (AGS)

argues that the denial of this claim by the state court on that basis is neither contrary to, nor involves an unreasonable application of, clearly established federal law. *Id.* at 18-22 [Doc. No. 14.1 at 23-27].

Petitioner replies that an investigation into the conflict, which should have been conducted by his appointed appellate counsel who first brought it to Petitioner's attention, but failed to raise it on appeal, is necessary, and this Court should conduct an evidentiary hearing because it is beyond his capacity as an incarcerated person to investigate. *See* Traverse at 5-6 [Doc. No. 16 at 5-6]. He argues that even assuming each individual instance of alleged deficient performance can be seen as sound trial strategy or simple error, cumulatively they show a pattern of deficient performance which prejudiced him. *Id.* at 6-7. Finally, he contends that to the extent his claims are barred based on a failure to raise them on direct appeal rather than on habeas, it was caused by ineffective assistance of his appointed appellate counsel, and any default should be excused on that basis. *Id.* at 7-8.

Claim 2 was presented to the state supreme court in a habeas petition. *See* Lodgment No. 16 at 15-22 & Ex. A at 3 [Doc. No. 15.25 at 25-32, 39]. The petition was denied by an order which stated: "Petition for writ of habeas corpus denied." Lodgment No. 17, *In re Torres*, No. S230940, order at 1 (Cal. Apr. 13, 2016) [Doc. No. 15.26 at 1]. It was also presented to the appellate court in a habeas petition. *See* Lodgment No. 14 at 3-82 [Doc. No. 15.23 at 3-82]. The appellate court denied that petition in an order which stated:

> In his petition for writ of habeas corpus, Torres contends his trial counsel was ineffective for several reasons. All of his contentions, however, were reviewed both by the trial court as part of a *Marsden* hearing and by this court on review of the denial of *Marsden* motions. (See *People v. Marsden* (1970) 2 Cal.3d 118.) Torres does not submit any additional evidence to support these claims, but instead relies only on the reporter's transcript from his appeal. Because the claims are identical to those raised on appeal, they are barred because either they were raised and rejected on appeal; or, if they were not raised on appeal, they could have been. (*In re Reno* (2012) 55 Cal.4th 428, 476, 490; *In re Waltreus* (1965) 62 Cal.2d 218, 225; *In re Dixon*

(1953) 41 Cal.2d 756, 759.)

It appears the only novel claim of ineffective assistance of counsel is premised on Torres's contention that his trial counsel was the president of the local chapter of the NAACP and, in that role, frequently worked with police officers. Torres asserts that because he was charged with assaulting police officers, his counsel "pulled her punches" and resisted proving that the officers were lying. His assertion, however, is entirely speculative and unsupported by any evidence. Conclusory allegation made without any explanation of the basis for the allegations do not warrant relief. (*People v. Duvall* (1959) 9 Cal.4th 464, 474.) Likewise, his contention that the trial judge was biased against him is entirely speculative and unsupported by any evidence of actual bias.

Lodgment No. 15, *In re Torres*, No. D068907, order at 1-2 (Cal.App.Ct. Oct. 26, 2015) [Doc. No. 15.24 at 1-2].

Claim 2 was also presented to the trial court in a habeas petition. *See* Lodgment No. 12 at 3-82 [Doc. No. 15.21 at 3-82]. The petition was denied in a written order which stated in relevant part:

In this case, although petitioner makes numerous allegations regarding what trial counsel did or failed to do, petitioner's complaint is essentially that the trial did not proceed according to his plan because counsel did not consider nor adopt petitioner's suggestions and input as to trial strategy. Petitioner claims counsel should have declared a conflict of interest in representing petitioner on account of her executive position with the NAACP, presented certain exculpatory evidence and argued Post Traumatic Stress Disorder as a defense. However, petitioner fails to articulate and prove how trial counsel's representation was deficient and how the deficient performance prejudiced his defense under the legal standard [of *Strickland v. Washington*, 466 U.S 668, 687 (1984)]. An alleged conflict of interest due to her role as president of the NAACP (San Diego Chapter) and work with the San Diego Police Department is not evidence of deficient performance, just like the choice not to argue Post Traumatic Stress Disorder, which appears to have been a strategic decision, does not establish that counsel's performance was deficient. (See Trial Transcript at pp. 668-669.)

Lodgment No. 13, *In re Torres*, No. HC 22094, order at 3-4 (Cal.Sup.Ct. Aug. 28, 2015)

16cv0870-MMA (AGS)

[Doc. No. 15.22 at 3-4].

"Before we can apply [the] standards [of 28 U.S.C. § 2254(d)], we must identify the state court decision that is appropriate for our review. When more than one state court has adjudicated a claim, we analyze the last reasoned decision." *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). The appellate court order denying habeas relief is the last reasoned decision as to Petitioner's claim alleging a conflict of interest, as well as those claims alleging a failure to admit relevant evidence which were raised and rejected on appeal in connection to the *Marsden* claim. The appellate court did not address the claim that counsel was deficient in failing to present a defense based on PTSD, and the trial court order denying habeas relief is the last reasoned decision as to that claim. As discussed below, the silent denial by the California Supreme Court is the only state court decision addressing the claim that counsel was deficient for using alcohol during trial.

For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must show that counsel's performance was deficient. *Strickland*, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Petitioner must also show that counsel's deficient performance prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." *Id.* To show prejudice, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. *Id.* at 694. A reasonable probability in this context is "a probability sufficient to undermine confidence in the outcome." *Id.* Petitioner must establish both deficient performance and prejudice in order to establish ineffective assistance of counsel. *Id.* at 687.

"The standards created by *Strickland* and section 2254(d) are both 'highly deferential' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). These standards are "difficult to meet" and "demands that

state court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Petitioner first contends that his trial counsel was acting under a conflict of interest arising from her position at president of the local chapter of the NAACP. *See* Pet. at 14-15, 25-26 [Doc. No. 1 at 17-18, 27-28].  He contends counsel wanted to maintain a good working relationship with the San Diego Police Department, and did not want to antagonize them, and therefore failed to aggressively cross-examine the police officer witnesses, failed to introduce relevant evidence, and failed to present a defense that the aggressive tactics used by the officers triggered his PTSD. *Id.*

A criminal defendant is entitled under the Sixth Amendment to representation free from conflicts of interest. *Wood v. Georgia*, 450 U.S. 261, 271 (1981).  A conflict of interest violates the Sixth Amendment where the conflict "adversely affected (the) lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 351 (1980).  If Petitioner proves such a conflict existed, prejudice is presumed. *Mickens v. Taylor*, 535 U.S. 162, 166 (2002).

It was objectively reasonable for the state court to find that Petitioner had not alleged an actual conflict of interest simply by virtue of defense counsel's position as president of the local chapter of the NAACP. *See Bonin*, 59 F.3d at 827 ("In the absence of an 'actual' conflict which squarely places the interests of the client in opposition to those of the attorney, and is likely to compromise a reasonable attorney's ability to comply with his legal and ethical obligations to represent his client with undivided loyalty, the *Cuyler* standard cannot be met.").  As discussed below, the state court correctly found that defense counsel effectively cross-examined the police officers by pointing out whatever inconsistencies arose from even minor differences in their preliminary hearing testimony and out-of-court statements, vigorously argued to the jury that Petitioner was acting in self-defense, and was not deficient in failing to present relevant evidence or a defense based on PTSD.

In his Traverse, Petitioner requests an evidentiary hearing in order "to investigate

the depth of this conflict of interest." Traverse at 7 [Doc. No. 16 at 7]. An evidentiary hearing is not necessary where, as here, the federal claim can be denied on the basis of the state court record, and where the petitioner's allegations, even if true, do not provide a basis for habeas relief. *Campbell v. Wood*, 18 F.3d 662, 679 (9th Cir. 1994). As discussed below, it is clear from the state court record that even if it is true that counsel had a good working relationship with the police as a result of her position with the NAACP, it did not prevent her from adequately cross-examining the police officers, introducing relevant evidence, or presenting a PTSD defense. Accordingly, an evidentiary hearing is neither necessary nor warranted to address this claim. *Id.*

Petitioner challenges the findings of the trial and appellate courts that the police officer witnesses were impeached, to the extent possible, with inconsistencies between their preliminary hearing testimony, their trial testimony, and any out-of-court statements. In Petitioner's post-trial *Marsden* motion he contended that his trial counsel had not sufficiently impeached these witnesses, but when told by the trial judge that defense counsel had impeached them to the extent possible, and had vigorously argued to the jury that Petitioner was acting in self-defense, Petitioner was unable to identify any areas of impeachment which had not been covered by counsel. *See* Lodgment No. 5, Reporter's Tr. vol. 6 at 743-46 [Doc. No. 15.12 at 3-6].

Petitioner now contends counsel should have introduced a two-minute video which showed him being taken into custody, arguing that it showed the officers acting aggressively and striking him several times. *See* Pet. at 15, 28, 33 [Doc. No. 1 at 18, 30, 35]. Defense counsel explained that she did not want to introduce the video because it made Petitioner look dangerous, and that she did not think it was relevant because the issue at trial was what happened at Petitioner's apartment door, not when he was taken into custody by a SWAT team about ninety minutes later. *See* Lodgment No. 4, Reporter's Tr. vol. 3 at 8 [Doc. No. 15.6 at 4]. When asked by the trial judge "why on earth would it help you to play the video that a whole SWAT team had to take you down and bring you into a police car?", Petitioner replied that the video showed an officer

being aggressive with him while he was resisting their efforts to take him into custody. *Id.* at 9-13 [Doc. No. 15.6 at 5-9].

It is clear that a video which showed SWAT officers being aggressive with Petitioner while he struggled against their efforts to take him into custody ninety minutes after the encounter at his door with different officers, was not relevant to his defense that the officers who came to his door to ask him to turn down his music were the aggressors in their fight. It also could have harmed his defense to the other charges arising from the encounter with police when he was riding his bicycle, which were based on conduct similar to what he describes is shown on the video. The decision not to introduce the video, because in counsel's opinion it made Petitioner look dangerous – an opinion echoed by the trial judge, fell within the "wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 689. Petitioner's contention that trial counsel should have introduced photographs of his injuries in order to show the severity of his encounter with the police fails for the same reason. *See id.* ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.").

Petitioner next contends counsel should have introduced a police report which stated that two taser cartridges were collected from Petitioner's hallway, and the cartridge found furthest from the door belonged to Officer Minton. *See* Pet. Ex. Q at 1 [Doc. No. 1 at 222]. Petitioner argues that the police report confirms his testimony and that of his neighbor across the hall regarding the relative positions of the officers and Petitioner during their struggle, and conflicts with the testimony of Officers Minton and Meeks in that regard. *See* Pet. at 29-30 [Doc. No. 1 at 31-32]. Given the nature of the encounter, in particular the evidence that Petitioner was shot with the tasers during a frantic struggle and pulled the taser barbs out himself, which the neighbor witnessed through the peephole in his door, it was reasonable for defense counsel to conclude that the relative positions of the taser cartridges after the struggle was insignificant. *Strickland*, 466 U.S. at 689.

Petitioner contends counsel failed to introduce evidence that Lieutenant Goldberg erroneously informed the media on the night of the December incident that Petitioner had thrown his dog at the police, ignored evidence that his eviction notice referenced him throwing his dog at the police, and should have introduced "a website article" titled "Man Allegedly Throws Puppy at Cops," because the evidence showed that the police made conflicting statements about what happened that night. *See* Pet. 28-29, Ex. A at 15-17 [Doc. No. 1 at 30-31, 63-65]. Defense counsel explained that the police officers consistently testified that Petitioner threw his dog at a wall in his apartment, and there was no testimony he threw his dog at the officers. *See* Lodgment No. 4, Reporter's Tr. vol. 3 at 9 [Doc. No. 15.6 at 5]. Counsel said the media statement was not relevant because Petitioner was not charged with animal abuse, and the officer who made the statement was not an eyewitness but was merely repeating something he was told. *See* Lodgment No. 5, Reporter's Tr. vol. 1 at 12 [Doc. No. 15.7 at 14]. Counsel indicated that she was in possession of a video of the officer's statement to the media, acknowledged that because the two officers involved in the altercation had not prepared police reports the second-hand statement to the media might have impeachment potential, and said she intended to bear that in mind when deciding whether to seek admission of the evidence. *Id.* at 12-15 [Doc. No. 15.7 at 15-17]. Counsel noted that she had sent her investigator to determine why the eviction notice contained a statement about Petitioner throwing a dog at the police. *Id.* She also called Lieutenant Goldberg as a defense witness at trial, who testified that he did not recall who told him Petitioner had thrown his dog at the officers. *Id.*, vol. 5 at 570-74 [Doc. No. 15.11 at 94-98]. Petitioner has not shown that his trial counsel's performance as to this issue was deficient. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."). The same is true regarding Petitioner's allegation that a neighbor above his apartment had made previous noise complaints against him, which the trial judge said was irrelevant and "if anything, it would hurt you." Lodgment No. 5, Reporter's Tr. vol. 1 at 7 [Doc. No. 15.7 at 9].

16cv0870-MMA (AGS)

Petitioner contends counsel should have presented evidence that a police officer attempted to adopt his dog, which Petitioner said was taken to an animal shelter after his arrest and held until he arranged for it to be placed with his cousin. *Id.* at 6-7 [Doc. No. 15.7 at 8-9]. He argued that it showed a lack of professional judgment by the officer. *Id.* Defense counsel indicated that she was aware of the issue, and thought it was irrelevant. *Id.* at 13-14 [Doc. No. 15.7 at 15-16]. The trial judge indicated that she probably would not allow the evidence to be admitted because it was irrelevant. *Id.* at 18-19 [Doc. No. 15.7 at 20-21]. Petitioner's contention that trial counsel was deficient in failing to introduce that evidence does not support a finding of either deficient performance or prejudice, and it was objectively reasonable for the appellate court on habeas to reject this claim on the same basis it rejected it on direct appeal, that it did not demonstrate ineffective assistance of counsel. *Strickland*, 466 U.S. at 687; *Richter*, 562 U.S. at 105.

Petitioner next alleges defense counsel admitted his guilt when she stated near the beginning of her closing argument:

> Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. In deciding whether the people have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. And unless the evidence proves the defendant guilty beyond a reasonable doubt, he's entitled to an acquittal, and you must find him guilty (sic).

Lodgment No. 5, Reporter's Tr., vol. 5 at 693 (Doc. No. 15.11 at 217].

Taken in context, it is clear that defense counsel misspoke. The court reporter added the "sic" after counsel's failure to say "not" guilty, indicating that the audience understood it to be a misstatement. Furthermore, the omission immediately followed an exhortation by defense counsel that Petitioner was entitled to an acquittal, and no reasonable juror would have perceived that defense counsel had admitted Petitioner's guilt.

Because this claim does not rely on facts outside the record on appeal, it could

have been raised on direct appeal. *People v. Salcido*, 44 Cal.4th 93, 172 (2008). As set forth above, the appellate court denied this aspect of Claim 2 without reaching the merits of the claim because it could have been but was not raised on direct appeal. *See* Lodgment No. 15, *In re Torres*, No. D068907, order at 1 [Doc. No. 15.24 at 1]. For the reasons set forth above, the Court denies the claim irrespective of any failure to properly present it to the state court because it is so completely lacking in merit as to fail to present a colorable claim. *Castille v. Peoples*, 489 U.S. 346, 351 (1989) (holding that a claim is not exhausted where it is presented in a manner which precludes consideration by the state court); 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *Acosta-Huerta v. Estelle*, 7 F.3d 139, 142 (9th Cir. 1992) (holding that a district court can deny an unexhausted claim if it does not present a colorable claim for relief).

Petitioner next argues that his trial counsel failed to present a defense that his actions could be explained or should be excused due to PTSD. *See* Pet. at 33-34 [Doc. No. 1 at 35-36]; Pet. Ex. A at 15-16 [Doc. No. 1 at 63-64]. The trial court rejected this claim on habeas, stating that defense counsel's choice not to argue PTSD "appears to have been a strategic decision, [and] does not establish that counsel's performance was deficient. (See Trial Transcript at pp. 668-669.)" Lodgment No. 13, *In re Torres*, No. HC 22094, order at 3 [Doc. No. 15.22 at 3].

The pages of the trial transcript cited by the trial court reference a discussion outside the presence of the jury:

> **Defense Counsel**: I noticed that the prosecutor used the term P.T.S.D., Post-Traumatic Stress Disorder. But that has never been defined. Neither did we have an expert to testify to that. And so I don't know if that's going to be a problem. And I don't know what the jurors know about it and, you know, whether Mr. Torres was diagnosed with it, who came up with the diagnosis. This is the reason I didn't put on an expert for that reason, so they would not speculate and say well, maybe he was having P.T.S.D. at that moment and that may have clouded his judgment. But we don't have a definition of P.T.S.D.

**The Court**:  Well, frankly, P.T.S.D. is not relevant to the case, even by your client's own admission.  He said that nothing that happened on December 15th was related to the P.T.S.D.  It came out of your client's mouth, over the objection of the prosecutor, so I don't know how the defense can complain when your client put in the record that he has P.T.S.D.  So there we have it.  So I mean, I – I mean, the – both – I just – the only problem I'd have is if you stated in your closing saying that this was for some reason an excuse, which I'm sure you're not going to do.

**Defense counsel**:  I am not, your honor.

**The Court**:  So as far as I'm concerned, really it's a red herring, anything to do with P.T.S.D., because it – particularly with counts one and two, which are general intent crimes.  So I don't know what you're asking at this point.

**Defense Counsel**:  My only concern is that the jurors heard "P.T.S.D." It has not been defined, and whether that's going to be confusing to them or if they're going to try to find out what the definition is -- .  But it is true, your honor, I was not using it as a defense or an excuse, and that's why I stayed away from it.

**The Court**:  Right.  I think that's the better course of action.  And I've already told the jury I don't know how many times: Don't go on the internet and don't do research.  I assume they're following my instructions, so I mean, I just don't see that it'll be an issue.

**Defense Counsel**:  Okay.

**The Court**: Okay?

**Defense Counsel**:  All right.  Thank you.

**The Court**:  You wish to be heard on that?

**Prosecutor**:  Just that over my objection he did say that, and so it's not something that is -- I mean it's out there, so I have to address it, and I believe I addressed it in a -- in a lawful way, that given the facts of this case it's irrelevant.

**The Court**:  Yeah, absolutely.  Which I think was exactly what Mr. Torres said.  You know, he said, "I'm not saying that's why I did any of this."  Okay.

Lodgment No. 5, Reporter's Tr. vol. 5 at 668-70 [Doc. No. 15.11 at 192-94].

Petitioner testified at trial that he was using the bathroom when there was a knock at his door and he heard someone say they were there on a noise complaint, but he did not know if it was the security guard who had returned or someone else, and he could not confirm who it was because his peephole was blocked. *Id.*, vol. 4 at 372-73 [Doc. No. 15.10 at 14-15]. When he opened the door his dog tried to run out, so he grabbed him by the tail, the only available manner of grabbing him, and tried to close the door, but the female officer held it open and the male officer said "that's no way to treat your dog." *Id.* at 373-75 [Doc. No. 15.10 at 15-17]. As Petitioner was attempting to close his door, the male officer kicked it in, kept moving forward, and threw a punch at Petitioner. *Id.* at 375 [Doc. No. 15.10 at 17]. Petitioner said he did not see the punch coming, and took its full brunt, and without time to think "went into defensive mode," engaged in a brief defensive struggle with the officers in the hallway after they dragged him out of his apartment, and quickly managed to get back inside and lock the door. *Id.* at 375-81 [Doc. No. 15.10 at 17-21]. He said he did not know the people at his door were police officers until after the struggle had ended and he was back inside his apartment. *Id.* at 382 [Doc. No. 15.10 at 22]. He testified that he was defending himself against what he believed to be an unwarranted and unprofessional forced invasion into his home. *Id.*, vol. 5 at 580-96 [Doc. No. 15.11 at 104-20].

Petitioner mentioned PTSD only three times during his trial testimony. He testified on direct examination, after a withdrawn objection by the prosecutor, that: "With Post-Traumatic Stress Disorder, I'm going to defend myself." *Id.* at 579 [Doc. No. 15.11 at 103]. Shortly thereafter, on cross-examination, he testified that his cousin had encouraged him to: "Tell your whole side of the story" and "let the world know about Post-Traumatic Stress Disorder." *Id.* at 585 [Doc. No. 15.11 at 109]. On recross-examination, Petitioner testified:

16cv0870-MMA (AGS)

**Prosecutor**: And you're not saying that your P.T.S.D. had anything to do with what happened on that night because your version of events is completely different than the officers'?

**Defense Counsel**: Objection; Argumentative.

**The Court**: Overruled.

**A**: I'm sure that my P.T.S.D. had some effect on my behavior that night. I'm fully aware of that.

**Prosecutor**: I'm talking about whether or not the officer hit you first.

**A**: That man came into my apartment, Mr. Romo --

**Q**: I'm just --

**A**: -- and punched me in the face.

**Q**: I'm just asking: It doesn't have anything to do with it, does it?

**A**: The P.T.S.D?

**Q**: Correct.

**A**: I don't control officer behavior.

**Q**: That's what I'm asking you. It doesn't have anything to do with it. It was the officer, according to your testimony, that started everything; right?

**A**: Yes. Yes, sir. Yes, sir.

**Q**: Okay. I just want to get that clear. So you're not using it as an excuse, cause you're not excusing anything. You're saying you don't have anything to excuse; right?

**A**: I'm saying that P.T.S.D. had an effect on my reaction to police officers in my behavior when I -- when I'm attacked. That's -- I don't know if it's excusable, but it definitely has an impact.

*Id.*, vol. 4 at 474-76 [Doc. No. 15.10 at 114; Doc. No. 18.1 at 3-4].

The trial judge was incorrect when she observed that Petitioner "said that nothing that happened on December 15th was related to the P.T.S.D." *Id.*, vol. 5 at 668 [Doc. No. 15.11 at 192]. Even the appellate court on direct appeal, although not presented with this

claim, observed that Petitioner "claimed that post-traumatic stress disorder (PTSD) had an effect on his behavior after he was attacked by the officer."  Lodgment No. 9, *People v. Torres*, No. D063150, slip op. at 12 [Doc. No. 15.18 at 12].  That court also found, in connection to the claim that his sentence should be mitigated as a result of PSTD, that Petitioner's own testimony, as quoted immediately above, "casts serious doubt on whether PTSD played any role in his actions on December 15, 2011, unless his version of events was believed." *Id.* at 37.

The record shows that Petitioner was diagnosed with PTSD by the Department of Veterans Affairs in 2010 and immediately began receiving treatment, that in 2012 he attended at 6-month program for individuals with PTSD "who use substances to self medicate," and that in 2012 he "was rated as 30% service connected for post traumatic stress disorder."  Lodgment No. 2, Aug. Clerk's Tr. at 24, 28, 86 [Doc. No. 15.2 at 27, 31, 89].  After trial, in preparation for sentencing, defense counsel retained Dr. Gregg A. Michal, Ph.D., a Forensic and Clinical Psychologist, and referred Petitioner for an examination for "determination of possible psychodiagnosis including PTSD and whether or not he suffered from any mental or emotional difficulties that might have impacted his perception during each of the two charged incidents. . . . whether he could be safely placed on probation and whether or not he was a suitable candidate for Veteran's Court for relief under PC 1170.9." *Id.* at 34-47 [Doc. No. 15.2 at 37-50].  Dr. Michal concluded that "the present evaluation did not support the presence of PTSD or of a combat-related stress disorder," but rather: "His central difficulty has to do with long-term development of alcohol dependence and his behavior related to the instant offenses was greatly affected if not even caused by his having been intoxicated.  It is the undersigned psychologist's opinion that if he were not intoxicated on alcohol at those times he would not have behaved in the manner leading to his present charges." *Id.* at 46 [Doc. No. 15.2 at 49].

As quoted above, defense counsel explained to the trial judge: "And I don't know what the jurors know about it and, you know, whether Mr. Torres was diagnosed with it,

who came up with the diagnosis.  This is the reason I didn't put on an expert for that reason, so they would not speculate and say well, maybe he was having P.T.S.D. at that moment and that may have clouded his judgment."  Lodgment No. 5, Reporter's Tr. vol. 5 at 668 [Doc. No. 15.11 at 192].  On its face that statement is somewhat ambiguous as to whether defense counsel knew if Petitioner had been diagnosed with PTSD prior to trial and knew who had diagnosed him, or, more likely, that she was worried the jury might speculate on those subjects.  However, Petitioner indicates that when he met with counsel on August 17, 2012, he provided defense counsel with: "VA medical/mental health treatment records for the petitioner's history of Post Traumatic Stress Disorder."  Pet. at 15 [Doc. No. 1 at 18].  Defense counsel was clear when she said: "I was not using it as a defense or an excuse, and that's why I stayed away from it."  Lodgment No. 5, Reporter's Tr. vol. 5 at 669 [Doc. No. 15.11 at 193].

In determining whether counsel's strategic decisions were reasonable, the Court must first consider whether that decision was based on a reasonable investigation. *Strickland*, 466 U.S. at 690-91 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").  A decision not to investigate "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691; *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999) ("A lawyer who fails adequately to investigate, and to introduce into evidence, records that demonstrate his client's factual innocence, or that raise sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance.").

The Court must presume counsel was aware of the Petitioner's PTSD diagnosis and believed that it was relevant only to sentencing, which would explain why she retained a doctor to examine Petitioner only after he was found guilty. *See Strickland*, 466 U.S. at 690 (holding that a petitioner must overcome a "strong presumption" that trial counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.").  It does appear odd from a review of the cold

record that defense counsel and the prosecutor failed to correct the trial judge when she incorrectly stated that Petitioner denied his actions were affected by PTSD. However, that failure would be consistent with what appears to have been everyone's belief that PTSD was not relevant to the defense that Petitioner reacted to an unwarranted and unprovoked home invasion and did not realize he was fighting with police officers, and would explain why defense counsel waited until after a guilty verdict to retain an expert. Petitioner conceded on direct appeal and in his petition for review in the state supreme court that California law does not recognize PTSD as a defense to his crimes, but is relevant only to sentencing. *See* Lodgment No. 6 at 62 [Doc. No. 15.15 at 71]; Lodgment No. 10 at 20 [Doc. No. 15.19 at 26]; *see e.g. Styers v. Schriro*, 547 F.3d 1026, 1035 (9th Cir. 2008) (holding that PTSD is relevant to sentencing in capital case even when it is not relevant to guilt); *United States v. Rice*, 458 Fed.Appx. 652, 653 (9th Cir. 2011) (same with respect to non-capital cases).

As set forth above, the state superior court denied this aspect of the ineffective assistance of trial counsel claim on the basis that the decision by defense counsel not to present PTSD evidence "appears to have been a strategic decision, [and] does not establish that counsel's performance was deficient," and thereafter immediately cited to the trial transcript where the trial judge (who was not the same judge who handled the superior court habeas petition), erroneously found that Petitioner had denied that his actions were affected by PTSD. This Court must determine whether that adjudication is contrary to, or involves an unreasonable application of, clearly established federal law, or if it was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Even if Petitioner could satisfy that standard by showing that the state superior court relied on an unreasonable determination of the facts because it cited to and relied on the trial judge's erroneous finding that evidence of PTSD was irrelevant because Petitioner denied his actions were affected by PTSD, Petitioner must still demonstrate that a federal constitutional violation occurred, that is, he must still demonstrate that he was prejudiced by any deficient performance by counsel. *Fry*, 551

U.S. at 119-22; *Frantz*, 533 F.3d at 735-36; *Strickland*, 466 U.S at 694.

In order to determine whether Petitioner was prejudiced by the failure to present evidence of PTSD, the Court must determine whether "the difference between the evidence that could have been presented and that which actually was presented is sufficient to 'undermine confidence in the outcome' of the proceeding." *Duncan v. Ornoski*, 528 F.3d 1222, 1240 (9th Cir. 2008) (quoting *Strickland*, 466 U.S at 694). The evidence that was actually presented was Petitioner's testimony that his PTSD affected his actions that night, but without any explanation as to what effect it had. The evidence that could have been presented, assuming it would have been ruled admissible, was the diagnosis by the Department of Veterans Affairs that Petitioner was diagnosed with PTSD and went through treatment before receiving a 30% disability rating, and perhaps an expert opinion on what effects PTSD may have had on Petitioner's actions that night.

However, the expert opinion actually obtained by the defense from Dr. Michal, albeit in preparation for sentencing, stated that: "the present evaluation did not support the presence of PTSD or of a combat-related stress disorder," and "that if he were not intoxicated on alcohol at those times he would not have behaved in the manner leading to his present charges." Lodgment No. 2, Aug. Clerk's Tr. at 46 [Doc. No. 15.2 at 49]. Petitioner argues that the Department of Veterans Affairs materials presented at his sentencing contradicts Dr. Michal's expert opinion. *See* Pet. at 33, Ex. A at 15-16, Ex. O at 1-2 [Doc. No. 1 at 35, 63-64, 212-13]. However, the information Petitioner relies on discusses possible effects of PTSD generally, and is not, as is Dr. Michal's report, based on an examination of Petitioner. *Id.* In addition, Petitioner conceded on direct appeal, both in the appellate and state supreme courts, that California law does not recognize PTSD as a defense to his crimes, but is only relevant to sentencing. *See* Lodgment No. 6 at 62 [Doc. No. 15.15 at 71]; Lodgment No. 10 at 20 [Doc. No. 15.19 at 26].

In addition to the concession of the unavailability of a PTSD defense under state law, and the fact that the expert opinion obtained by defense counsel did not support the defense, such a defense would have been incompatible with Petitioner's defense of self-

46

defense. The jury was instructed that Petitioner acted in self-defense if he "reasonably believed that he was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully," and that the prosecution bore the burden of proof beyond a reasonable doubt that Petitioner did not act in self-defense. Lodgment No. 1, Clerk's Tr. vol. 1 at 149-50 [Doc. No. 15.1 at 155-56]. In finding Petitioner guilty of assault and battery on the officers, the jury obviously credited the testimony of the eyewitnesses that Petitioner attacked the officers without provocation, that is, that he did not strike the officers with a reasonable belief that he was about to be struck by them, and obviously rejected Petitioner's testimony that the officers attacked him without warning or provocation.

In sum, it is true that the cold record reflects that defense counsel and the prosecutor both failed to correct the trial judge when she incorrectly observed that Petitioner "said that nothing that happened on December 15th was related to the P.T.S.D." Lodgment No. 5, Reporter's Tr. vol. 5 at 668 [Doc. No. 15.11 at 192]. However, when taken in context, it appears that defense counsel and the prosecutor were agreeing with the trial judge that Petitioner was not using PTSD as a defense because it did not objectively excuse his actions, despite his testimony that he subjectively believed it had some effect. Accordingly, in light of the defense expert opinion that Petitioner's actions were not affected by PTSD, the concession on direct appeal that a PTSD defense was not available under state law, and the fact that a PTSD defense was not compatible with Petitioner's testimony that he was defending himself from an unexpected attack by unknown attackers, the Court finds that, even assuming Petitioner could satisfy the provisions of section 2245(d), he has failed to demonstrate "a probability sufficient to undermine confidence in the outcome" of his trial arising from the decision not to present a defense based on PTSD, and has therefore failed to show prejudice arising from that failure. *Strickland*, 466 U.S. at 694; *Duncan*, 528 F.3d at 1240.

Thus, the state court adjudication of this aspect of Petitioner's ineffective assistance of trial counsel claim, on the basis that defense counsel's failure to present a

PTSD defense was a strategic decision which did not amount to ineffective assistance of counsel, is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Even assuming Petitioner could satisfy those provisions, or demonstrate that the state court decision was based on an unreasonable determination of the facts, the Court finds that he has failed to show that he received constitutionally ineffective assistance of counsel because he is unable to demonstrate prejudice as a result of the failure to present the defense.

With respect to Petitioner's claim that defense counsel was ineffective due to her use of alcohol during trial, Petitioner raised the claim in his California Supreme Court habeas petition. *See* Lodgment No. 16 at 20 [Doc. No. 15.25 at 30]. The petition was summarily denied without a statement of reasoning or citation of authority. *See* Lodgment No. 17 at 1 [Doc. No. 15.26 at 1]. The claim was not presented in the state appellate or superior court habeas petitions, or on direct appeal. *See* Lodgment Nos. 12, 14 [Doc. Nos. 15.21, 15.23]. Thus, there is no lower state court opinion addressing this claim.

The Court will presume that the silent denial by the state supreme court was an adjudication on the merits of the federal Constitutional claim presented. *See Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Because the state supreme court did not articulate the reasons for denying the claim, this Court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court. *Id.* at 102. It is clear, for the reasons discussed above, that the state court could have reasonably denied Petitioner's claim that defense counsel provided ineffective assistance as a result of alcohol consumption during trial on the basis that trial counsel did not provide constitutionally ineffective assistance. *See*

*Bonin*, 59 F.3d at 838 (finding evidence that trial counsel may have been abusing drugs before and during trial irrelevant where there is no showing of deficient representation because, "once an attorney's conduct is shown to be objectively reasonable, it becomes unnecessary to inquire into the source of the attorney's alleged shortcomings.") (citing *Strickland*, 466 U.S. at 700).

Finally, Petitioner contends that even if each instance of alleged deficient performance can "individually be manipulated and argued as sound strategy or simple error," cumulatively they show counsel rendered deficient performance. Traverse at 6-7 [Doc. No. 16 at 6-7]. The Ninth Circuit has observed that "[w]e must analyze each of [petitioner's] claims separately to determine whether his counsel was deficient, but 'prejudice may result from the cumulative impact of multiple deficiencies.'" *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc)). The cumulative impact of counsel's errors can give rise to prejudice, particularly where a series of errors prevent the proper presentation of a defense. *Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998); *see also Harris v. Wood*, 64 F.3d 1432, 1438-39 (9th Cir. 1995) (finding that eleven errors by counsel amounted to cumulative prejudice because they raised a reasonable probability the outcome of trial might have been different).

As discussed above, Petitioner has identified no deficiencies of counsel which could accumulate. Even if he had, it is clear he has not shown that he was prejudiced, individually or cumulatively, by any of the alleged errors. *See Strickland*, 466 U.S. at 694 (holding that prejudice requires showing "a probability sufficient to undermine confidence in the outcome."); *Richter*, 562 U.S. at 105 ("The standards created by *Strickland* and section 2254(d) are both 'highly deferential' and when the two apply in tandem, review is 'doubly' so.") (citations omitted). The Court finds it was therefore objectively reasonable for the state court to find that defense counsel did not render constitutionally ineffective assistance. *Richter*, 562 U.S. at 105; *Strickland*, 466 U.S. at 694; *see also Pinholster*, 563 U.S. at 181 (holding that those standards are "difficult to

meet" and "demands that state court decisions be given the benefit of the doubt.")

In sum, the Court denies habeas relief as to those aspects of Claim 2 which were addressed on the merits in state court, because the state court adjudication is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. As to Petitioner's claim that defense counsel admitted his guilt during closing argument, the Court denies habeas relief notwithstanding any failure to properly exhaust state court remedies because it does not present a colorable claim for relief. Finally, assuming Petitioner could demonstrate that the denial of the PTSD aspect of his ineffective assistance of trial counsel claim is based on an unreasonable determination of the facts, the Court finds that habeas relief is not available because a *de novo* review of the claim reveals that Petitioner has not shown he was prejudiced by counsel's failure to present a PTSD defense. The Court therefore denies habeas relief as to Claim 2.

## D. Claim 3

Petitioner alleges in his final claim that his Sixth Amendment right to the effective assistance of counsel was violated by his appointed appellate attorney's failure to file a petition for writ of certiorari in the United States Supreme Court following the denial of his petition for review by the California Supreme Court, and the failure to present a claim alleging ineffective assistance of trial counsel based on counsel's conflict of interest and consumption of alcohol during trial. *See* Pet. at 35-37 [Doc. No. 1 at 37-39]. Respondent answers that this claim is unexhausted because it has not been presented to the state supreme court, but that the claim can be denied notwithstanding the failure to exhaust because it is without merit. *See* Ans. Mem. at 22-24 [Doc. No. 14.1 at 27-29]. Petitioner replies that he exhausted his state court remedies by presenting this claim in his first state supreme court habeas petition. *See* Traverse at 8 [Doc. No. 16 at 8]. Petitioner has submitted a copy of a second habeas petition he filed in the California Supreme Court while the instant action was pending, and argues that even if he did not exhaust Claim 3

in his first state habeas petition, he has now done so.  *See* Doc. No. 21.

In order to exhaust state judicial remedies, a state prisoner must present the state's highest court with a fair opportunity to rule on the merits of every issue raised in their federal habeas petition.  *Granberry v. Greer*, 481 U.S. 129, 133-34 (1987); *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995).  A claim must be "fairly presented" to the state court, that is, in a manner which allows that court to have "the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding."  *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).  The "fair presentation" requirement is not satisfied if a claim is presented in a manner which precludes consideration by the state court.  *Castille*, 489 U.S. at 351.

Petitioner argues (*see* Traverse at 8 [Doc. No. 16 at 8]), that the following statement in his state supreme court habeas petition should have adequately placed the state court on notice that he was raising an ineffective assistance of appellate counsel claim:

> The error in the opinion below is that the discovery of the conflict of interest didn't take place until the petitioner received a letter from his assigned appellate attorney dated August 15, 2014, almost two year[s] post conviction, describing the conflict of interest [and] stating it needs to be investigated. (See Exhibit G: pages 1-2, 5-6.)  The petitioner submitted these letters to both courts below as support or evidence to his claims with the impression the nature or character of the letter from a professional attorney practicing under the state bar to his client warranted credibility adding merit to the petitioner's claims and proof to the courts.  Both courts maintain no new reliable evidence was submitted to substantiate his claims.  This conflict of interest is substantiated again by the letter dated June 18, 2015 encouraging the petitioner to include this argument in a Writ of Habeas corpus as the "most fruitful" arguments written by the appellate attorney after receiving the denial to review appeal No. D063150 (See Exhibit D: Request for Review).

> Both courts below determined that this should have, and if not, could have been raised on appeal.  However, the petitioner brought the discrepancies he wished to raise at trial and this conflict of interest to the assigned appellate attorney's attention who claimed that they could not be raised or addressed because they are not part of the trial transcript (see Exhibit G: Petitioner's letters pages 3-4, 7, and 8) even though the trial court states they will be

available in the second Marsden hearing held September 19, 2012. (See Exhibit H: page 13 lines 4-16.)

> The petitioner made it clear to the appellate attorney issues he wanted to raise; however, by the rules of the court he cannot represent himself on appeal and is again at his attorney's discretion unable to raise these issues. His appellate attorney believes they cannot be raised as they are not part of the trial transcript and advises the petitioner to raise them in his petition for Habeas Corpus.

Lodgment No. 16 at 5-6 [Doc. No. 15.25 at 15-16].

Federal courts are required to liberally construe *pro se* prisoner habeas petitions, especially with regard to the determination as to which claims are presented. *Zichko v. Idaho*, 247 F.3d 1015, 1020 (9th Cir. 2001). However, the above statement was included in an attachment to a state habeas petition form in which only two claims were specifically identified, one challenging the denial of his *Marsden* motions and one alleging ineffective assistance of trial counsel. *See* Lodgment No. 16 at III-IV [Doc. No. 15.25 at 3-4]. The passage in the state supreme court habeas petition quoted above appears to constitute an explanation for the delay in presenting the conflict of interest claim (because Petitioner did not become aware of it until appellate counsel pointed it out), or an explanation why it and the other allegations of deficient performance of trial counsel were not presented on direct appeal, rather than a separate claim alleging ineffective assistance of appellate counsel.

As Respondent points out, claims of ineffective assistance of counsel which rely on matters outside the record, such as the conflict of interest and use of alcohol during trial claims, are, as Petitioner's appellate counsel advised him, required to be presented to the state court on habeas and not on direct appeal. *Salcido*, 44 Cal.4th at 172. In light of the fact that the ineffective assistance of trial counsel claims which Petitioner contends appellate counsel should have raised on direct appeal were presented to the state courts on habeas by Petitioner on advice of his appellate counsel, and were adjudicated on the merits, and in light of the fact that Petitioner never uses the word certiorari in his state

habeas petition (other than to point out that his appellate counsel informed him that: "I do not see any ground which would support the filing of a petition for certiorari" (Doc. No. 15.25 at 226)), even the most liberal construction of the state supreme court habeas petition cannot support a finding that Petitioner exhausted his state court remedies as to Claim 3 by presenting it in that petition.

The exhaustion requirement also can be met if there is an absence of state judicial remedies. *Castille*, 489 U.S. at 351 ("The requisite exhaustion may nonetheless exist, of course, if it is clear that respondent's claims are now procedurally barred under [state] law.") (citing *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982) ("[The exhaustion] requirement, however, refers only to remedies still available at the time of the federal petition.")). After Petitioner proceeded through one full round of state habeas, he waited five months after the state supreme court denied his habeas petition, and over a year after his conviction became final, before he filed a second habeas petition in the state supreme court presenting Claim 3. That petition was denied with a citation to *In re Clark*, 5 Cal.4th 750, 767-69 (1993) ("the general rule is still that, absent justification for the failure to present all known claims in a single, timely petition for writ of habeas corpus, successive and/or untimely petitions will be summarily denied," and describing the "fundamental miscarriage of justice" exception to that rule). *See* Doc. No. 21 at 3. It is therefore clear that Petitioner did not timely present Claim 3 to the state supreme court, and that it is now procedurally defaulted in this Court. *See Walker v. Martin*, 562 U.S. 307, 312-21 (2011) (holding that California's timeliness rule requiring that a petitioner must seek habeas relief without "substantial delay" as "measured from the time the petitioner or counsel knew, or should reasonably have known, of the information offered in support of the claim and the legal basis for the claim," is clearly established and consistently applied). The exhaustion requirement is therefore satisfied. *See Cassett v. Stewart*, 406 F.3d 614, 621 n.5 (9th Cir. 2005) ("A habeas petitioner who has defaulted his federal claims in state court meets the *technical* requirements for exhaustion; there are no state remedies any longer 'available' to him.") (quoting *Coleman v. Thompson*, 501

U.S. 722, 732 (1991)).

When a federal habeas court addresses the merits of a claim which has not been adjudicated on the merits in state court, pre-AEDPA *de novo* review is required. *Pirtle*, 313 F.3d at 1167-68. Under such a review, "state court judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that (his) detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." *Hayes*, 399 F.3d at 978; *see also Frantz*, 533 F.3d at 738 (holding that even if the state court does not address the constitutional issue, where the reasoning of the state court is relevant to resolution of the constitutional issue, that reasoning must be part of a federal habeas court's consideration even under a *de novo* review).

Petitioner has failed to show that he received ineffective assistance of appellate counsel due to his appointed appellate counsel's failure to raise the claims of ineffective assistance of trial counsel. As discussed above, Petitioner has not identified a meritorious ineffective assistance of trial counsel claim, and he has therefore failed to demonstrate ineffective assistance of appellate counsel for failing to raise such claims. *See Featherstone v. Estelle*, 948 F.2d 1497, 1507 (9th Cir. 1991) (holding that where "trial counsel's performance, although not error-free, did not fall below the *Strickland* standard," no prejudice arose from appellate counsel's failure to challenge trial counsel's performance on appeal); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989) (holding that appellate counsel has no constitutional obligation to raise every nonfrivolous issue on appeal because "[i]n many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.").

More fundamentally, the claims Petitioner contends should have been raised by his appellate counsel were in fact raised by Petitioner in his state habeas petition on the advice of appellate counsel. Petitioner admits his appellate counsel advised him to

pursue those claims on habeas. *See* Pet. Ex. M at 5-6 [Doc. No. 1 at 182-83]. As set forth above in the discussion of Claim 2, these claims were adjudicated on the merits on state habeas review. Petitioner has not presented a colorable claim for relief regarding this aspect of his ineffective assistance of appellate counsel claim.

Finally, Respondent argues that Petitioner's appointed appellate counsel owed no duty to file a petition for a writ of certiorari in the United States Supreme Court. Petitioner presents a letter from his appellate counsel indicating that counsel did "not see any ground which would support the filing of a petition for certiorari at the Supreme Court of the United States." *Id.* at 1 [Doc. No. 1 at 178]. As discussed above, Petitioner has not identified a federal constitutional error arising from his trial proceedings sufficient to support a writ of certiorari. Accordingly, this aspect of his ineffective assistance of appellate counsel claim fails under a *de novo* review. An evidentiary hearing is not necessary as to this claim, or any other claim presented, because Petitioner's claims can be denied on the basis of the state court record, and his allegations, even if true, do not provide a basis for habeas relief. *Campbell*, 18 F.3d at 679. Accordingly, the Court finds that Claim 3 is without merit under a *de novo* review, and therefore denies habeas relief as to Claim 3.

## CERTIFICATE OF APPEALABILITY

Rule 11 of the Federal Rules Governing Section 2254 Cases states that "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability is not issued unless there is "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Under this standard, a petitioner must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). For the reasons set forth herein, the Court finds that this standard has not been met in this case. Reasonable jurists would agree that the state trial court properly denied Petitioner's

16cv0870-MMA (AGS)

*Marsden* motions, Petitioner did not receive ineffective assistance of counsel at trial or on direct appeal, and the state court properly rejected Petitioner's claim that trial counsel was conflicted because of her position with the NAACP.  As such, the Court declines to issue a certificate of appealability.

### CONCLUSION

Based on the foregoing, the Court **DENIES** the Petition for Writ of Habeas Corpus.  The Court **DECLINES** to issue a certificate of appealability.  The Clerk of Court is instructed to enter judgment accordingly and close the case.

**IT IS SO ORDERED**.

DATE: August 22, 2017

HON. MICHAEL M. ANELLO
United States District Judge